IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MELINDA HO,

        Plaintiff,

        vs.               Case No. 08-1282-JTM

MICHELIN NORTH AMERICA, INC.,

        Defendant.

MEMORANDUM AND ORDER

On August 15, 2007, plaintiff Melinda Ho was driving north on I-135 when her car was struck by a pick-up truck driven by Linda Lange. Lange had been driving in the opposite direction when the left front tire on her truck lost its tread. The truck crossed the median and struck Ho's car, ultimately coming to rest upside down in the east ditch. Ho's car stopped facing south with its wheels in the ditch. Lange was killed in the accident; her husband, Neal Lange was a passenger in the truck. Ho was the only person in her car. She was extricated from the car and airlifted to the hospital. She subsequently filed this personal injury action against Lange, and a products liability action against defendant

Michelin North America, Inc., the manufacturer of the tire. Michelin is the only remaining defendant in the action.

The matter is before the court on four motions advanced by Michelin. Michelin has submitted three motions contending that experts identified by Ho are not qualified to give the proposed testimony pursuant to *Daubert*. It has also moved for summary judgment.

With respect to the *Daubert* motions, Michelin first contends that the court should exclude the testimony of William Woehrle, plaintiff's proposed tire expert, on the grounds that he is unqualified to give some of the cited opinions, and that all of his opinions are not shown to be reliable. Second, its seeks a determination that Ho's accident reconstruction expert, William Kennedy, is unqualified to go beyond the reconstruction of the accident itself and give opinions that the Lange truck was "uncontrollable" after the tire failure, and that Lange had insufficient reaction time to avoid the accident. Third, it argues that the second, substantially increased estimate of proposed damages advanced by Ho's proposed life-care expert, Tracy Wingate, should be excluded because Wingate's estimate is based on the results of a telephone conversation with plaintiff's physician, who now has testified that he does not believe the cited expenses are medically necessary.

The court finds that it need not resolve the more recent *Daubert* motions as to Kennedy and Wingate, as these are rendered moot by the earlier, linked motions as to the alleged defectiveness of the tire involved in the accident. Because the court finds that these

motions should be granted, any additional issues in the case will be addressed separately, if required.

***Daubert Motion as to Bill Woehrle***

Ho has presented Bill Woehrle as an expert in support of her claim. Woehrle states in his report that the tire had "insufficient fatigue endurance performance." (Rept. at 12). He has stated that this failure arose due to manufacturing defects, specifically (1) a significant variation and reduction and reversal in the belt step at the OSS [opposite shoulder side] shoulder, (2) a severe offset (dog ear) in each of at least two locations on the OSS shoulder; and (3) inadequate adhesion of skim rubber to the bottom belt. He further opines that the tire was defectively designed in not having a nylon cap ply. He does not believe that tire detread failures ever occur through impact or overdeflection.

Ho and Woehrle acknowledge that these options are contrary to generally accepted views among tire experts. See Dkt. 151, at 3 (acknowledging that "Woehrle expresses what may currently be a minority opinion").

Michelin has moved to disqualify Woehrle as inadmissible and unreliable under Fed.R.Evid. 702, citing decisions such as *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589

(1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); and *McCoy v. Whirlpool Corp*. No. 05-3337, 2008 WL 2808927, at *2 (10th Cir. July 22, 2008).

Under these decisions, the trial court undertakes a gatekeeping function to ensure that expert witness evidence materially and fairly assists the trier of fact. "To qualify as an expert, the witness must possess such 'knowledge, skill, experience, training or education' in the particular field as to make it appear that his or her opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for the truth." *Farmland Mut. Ins. Co. v. AGCO Corp*., 531 F.Supp.2d 1301, 1304 (D.Kan.2008) (citing *Life Wise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir.2004)). In *Daubert*, the Supreme Court set forth a list of non-exhaustive factors the court may consider: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community. 509 U.S. at 593-94. These factors are not a "definitive checklist or test," and the reliability should be closely "tied to the facts of a particular case." *Kumho*, 526 U.S. at 150 (internal quotations omitted). The court has broad latitude in determining these factors as a reasonable measure of reliability. *Id*. at 153. In appropriate cases, such as this one, *Daubert* motions may be resolved on the pleadings and the exhibits submitted by the parties. *See Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir.2000).

Michelin argues that Woehrle is both not qualified to offer the cited expert testimony (particularly with reference to plaintiff's warning and design defect claims), and, further, his opinions are unreliable.

In her Response, Ho argues that Woehrle is qualified in light of his "enormous experience" in prior employment with tire maker Uniroyal. (Dkt. 151, at 5). She contends that the methods employed by Woehrle were comparable to those employed by Michelin's experts (*id.*, at 4), and indeed, that the opinion offered by one of Michelin's experts, Glenn Follen "is far less plausible than Woehrle's." (*Id.* at 10-12). More generally, she attacks Michelin's motion itself as seeking to have the court "usurp the role of fact-finder," and in doing so "give Michelin the benefit of every possible doubt, to read all evidence in Michelin's favor, and to overlook any weaknesses in the evidence upon which Michelin relies." (Id. at 2). She contends that "Michelin's harping upon 'general acceptance' recalls the days of a restrictive legal standard that simply no long [sic] applies in this Court." (Id. at 7).

The plaintiff's larger attack on the defendant's motion does not up.  The court does not usurp the fact-finder's role by undertaking the gatekeeping function which is mandatory under *Daubert*. The court is required to perform this function, and the burden is on the proponent of expert testimony to show its reliability. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). Thus, Ho's entire discussion as to the relative unreliability

of Follen simply misses the mark — it is not a question of which of the two is "less plausible," but whether Woehrle's opinions are actually reliable, and the burden is on Ho to make this showing. Further, defendant does not appear to argue that the lack of general acceptance for Woehrle's opinions is fatal in itself to the admissibility of his testimony. It argues correctly, rather, that the court may take account of a lack of general acceptance as one factor under *Daubert*.

William Woehrle worked for 25 years at Uniroyal and Uniroyal Goodrich Tire Company, and has been steadily involved with tires for 40 years. At Uniroyal, Woehrle was a director of product evaluation and manager of testing services, which included responsibility for all testing and tire failure analysis for all manufacturing, research and development company-wide. He is a past president of the Tire and Rim Association, and a past chairman of the Tire Engineering Policy Committee for the Rubber Manufacturer's Association, and Chairman of the Highway Tire Committee of the Society of Automotive Engineers. He teaches traffic accident investigation classes involving tires, and has done so for 30 years. Woehrle worked 14 years at an independent automotive testing company, of which he was owner and president. The  company was dedicated to serving the automotive industry, focusing on testing services which included quality/durability/reliability evaluations and tire examinations, including failure analyses.

Woehrle states in his report that "[t]he fundamental durability requirement of a tire is that it should hold together until the tread wears out, assuming that the tire is not abused." (Woehrle Report, at 9). He has testified that a tread separation failure of a tire typically happens in a fraction of a second. When the belts are lost, "[t]here's nothing else holding the tire together circumferentially other than a thin layer of rubber between the carcass cords," and "as soon as that happens the tire blows up." (Woehrle dep. at 96-96).

Woehrle states in his report that the Lange tire "failed from a complete detachment of the tread and top belt, together with a partial detachment of the bottom belt." (Woehrle Report, at 3). The bottom belt detachment is the reason that the carcass of the failed tire is split.

> The separation and subsequent detachment [of the tire] started with premature fractures (cracks) between the top and bottom belts, together with premature fractures between the bottom belt and the radial ply carcass. These fractures were the result of overall, insufficient fatigue endurance performance for the subject tire.

*Id.*

At the beginning of his review of the evidence, Woehrle "performed an analysis as to whether the failure in the subject tire was due to abuse on the part of the owner," and be states he believes there is "no significant evidence on the subject tire that would indicate abuse." (*Id.* at 4).

7

According to Woehrle, the most common forms of abuse of tires by owners are over-deflection (i.e. under-inflation or overloading), impact damage, excessive speed, and improper repair. Woehrle states that he found no significant evidence indicating that the failed Lange tire had suffered abuse of any of these types. With respect to alleged evidence that the failed tire had been run in an overdeflected condition, Woehrle testified, "Premature symmetrical shoulder wear, especially on a front tire, as an evidence of over-deflection doesn't exist on this tire or it's not significant." (Woehrle dep. at 188).

Asked if a road hazard impact could cause a tread detachment, Woehrle responded that "I have not found a tire where that indeed has explained the tread and belt separation....  Impact – the consequence of an impact is a rupture, not a separation, and I've said that repeatedly." (Woehrle dep. at 50). In his experience with tire testing, "we were puncturing and repairing tires right and left and the consequence was an air pressure loss, not a separation failure." (*Id*. at 140).

When asked, "So how do you come to the conclusion that it – an impact does not lead to a tread and top belt detachment?" Woehrle responded:

> The experiences that I have with so many tires, including tires I use to train police officers in Michigan. I've got several examples of ultimate catastrophic consequence of an impact. The tire ruptures. It doesn't separate. And I have – I use those examples repeatedly in my training of police officers in Michigan.
>
> The RMA publication, when it refers to the consequence of an impact – by "publication," I'm referring to "The Care and Service of Automobile and

> Light Truck Tires." And the singular example of a consequence of an impact is a rupture. In fact, they call it a rim bruise. That's what happens when a tire slams into that too [sic] big of a pothole. It's not a separation.

(*Id*. at 52-53). He also testified, "I cannot think of any tire that I've ever seen where I would explain the belt separation or ply separation failure as being caused by an impact. I've never seen them." (*Id*. at 54).

According to Woehrle, "in the location of the radial split in the carcass of the subject tire, the innerliner is only split radially and precisely between adjacent carcass cords, with no additional damage to the innerliner in any other direction or at any other location in the tire. The innerliner is not torn, cut, or even scuffed circumferentially." (Woehrle Supp'l Rep. at 2).

> Fundamentally, any damage from road hazards does not lead to any significant amount of intracarcass pressurization that would cause a belt separation. A puncture through the tire generally causes a leak and loss of pressure. Nevertheless, the point is that the puncture eventually leaks, and if left uncorrected, the tire can be expected to ultimately either go flat or fail in the sidewall — not at the belt edges.

> ...

> Intracarcass pressurization results from breaches such as mounting damage, interliner splice openings and fully exposed carcass cords in the air chamber, which are not accompanied by the continued pathway to the outside through a puncture hole (even if obstructed by the retained road hazard).

(*Id*. at 3).

Woehrle conducted a test simulating the impact of a road hazard on a tire of a similar design. He then concluded: "The exemplar tire was demounted and the innerliner was inspected. There was no evidence whatsoever of any radial split in the innerliner." (*Id*.).

In his work at Uniroyal, William Woehrle learned that, for a tire test to produce a belt separation failure, the tire had to be normally deflected and not over-deflected. "To say it another way, in order to produce belt separation failures, the test that has to be run cannot over-deflect the tire, lest, you don't get a belt separation failure." (Woehrle dep. at 44-45). Woehrle testified that, when he worked for Uniroyal, this fact was understood throughout its research and development group.

According to Woehrle,

there is now overwhelming empirical evidence and technical publications that are above reproach which show that overdeflection does not lead to belt separation failures. This truth has been in front of the tire industry for decades. The federal government has repeatedly stated that the traditional FMVSS 109 and 119 endurance tests (featuring overdeflection) are not effective. While these principles and relationships are widely known and well understood, the defense community within the tire industry seems to remain in the state of denial.

(*Id*. at 4).

Woehrle believes that the Lange tire failed due to (1) a "significant variation and reduction in the belt step and ultimate reversal" on the tire's opposite shoulder side [OSS],

and (2) a "severe offset (dog-ear) and adverse splice in the bottom belt" on the shoulder side [SS]. (Woehrle Rep. at 3). This offset "was found to be well within the region wherein the separation and detachment began." (*Id*. at 5).

Woehrle believes that inadequate adhesion of the belt skim rubber, the tire's age, and the absence of a full zero degree nylon cap ply may have contributed to the failure.

As to the alleged belt step defect, Woehrle states in his report that

> the shoulder region, which contains the belt edges, is critical. Virtually all of the dimensions in this portion of the tire must be precisely controlled within extremely tight tolerances. Among the most critical of these dimensions is the belt step, from the narrower top belt to the wider bottom belt.... In regions where this step changes significantly in magnitude, this transition is corrupted, and abnormally high strain energy densities can emerge. Understandably, whenever the top belt edge extends over the edge of the bottom belt, creating the unintended 'umbrella' instead of 'pyramid' configuration, the tire can be expected to have totally unacceptable fatigue endurance performance.

(*Id*. at 10-11).

According to Woehrlre, "[o]n the failed tire carcass, the top belt OSS edge impression in the rubber covering the top surface of the bottom belt revealed a very severe reduction in belt step-off in the 1:30-8:00 region. This off center belt condition lead to a reversal ('umbrella' instead of a 'pyramid') in approximately the 3:30-4:30 region." (*Id*. at 5).

With respect to the alleged dog-ear defect, Woehrle has testified that he found "a very severe dog-ear ... in the bottom belt which is now detached," and another "severe'

11

dog-dear on the opposite side. (Woehrle dep. at 89, 97). He testified that, through his experience at Uniroyal and in other cases on which he has worked, he has "been able to derive a cause-effect relationship between dog-ears and root causes of belt separation failures." (Woehrle dep. at 92).     He believes that the dog-ear was one factor in the failure of this tire, and that, "it's — this dog-ear in the bottom belt combined with the umbrella step-off condition in this bottom belt that created the leading edge flap of the top belt that allowed this side of the tire to detach ... so this is where things started." (*Id*. at 96). "The polish, the creation of the leading edge flaps on both the top and bottom belt and the greatest degree of polishing occurs in that region and that happens to be where the dog-ears are and happens where the umbrella belt configuration is and that's where things started...." (*Id*. at 262-63).

According to Woehrle, "the massive amount of bare brassy wires" showing in the tire is "consistent with an adhesion malfunction." (Woehrle dep. at 98-99). This is because "the brass is consumed in the bonding process with the sulfur and the rubber and the copper and the brass, and so when things are pulled apart, the brass should have been consumed, and in fact, that copper sulfide is black in color, not brassy in color, or bare steel wires ought to be seen." (*Id*. at 273-74).

Woehrle also opines that the Lange tire should have had a nylon cap ply, since this "offers ... more miles before failure [and] gets you out to further miles at normal highway speed, invariably." (*Id*. at 145).

The court finds that, while Woehrle does have extensive experience in tire testing, his testimony does not satisfy *Daubert* standards as to the claims of design or warning defects. In her Response to Michelin's motion, Ho provides no rejoinder to Michelin's specific challenges as to Woehrle's expertise as to her claims of warning or design defect.

As to the failure to warn claim, Woehrle admitted in his deposition:

Q.   You don't hold yourself as — out as an expert in the effectiveness of warnings, correct?

A.   Correct.

Q.   You also don't hold yourself out as an expert on sizing, lettering, how human beings may react to certain warnings in terms of their apparent size or wording, correct?

A.   Correct.

(Woehrle dep. at 69). Woehrle has also never designed a steel-belted radial tire, or any tire that has ever been placed in product. (*Id*. at 62). He has stated that he is not a qualified tire designer and would not hire himself to design a tire. (*Id*. at 64). Given these admissions, Woehrle is not qualified to give testimony as to the claims of defective warning or design. Further, in addition to her failure to show that Woehrle is qualified to give the proposed

13

testimony, Ho has failed to show that Woehrle's testimony would be reliable on these issues.

As to the alleged warning defect, Ho claims that Michelin, like the remainder of the tire industry, fails to adequately inform the public as to the dangers of aged tires. But Woehrle specifically acknowledged in his deposition that age was not factor in the failure of this specific tire:

> Q.   You're not going to be offering an opinion, I guess, or I don't know, maybe you are, any kind of opinion regarding warnings where Michelin or any other tire company did or didn't do anything in terms of warning its customers about age of tires that contributed to the failure in this particular case? I didn't see anything in your report. I just want to make sure that we don't —
>
> A.   Well, I say on Page 10, is that — the tire industry, not just Michelin, but the tire industry isn't close to communicating to the consumer this issue regarding age. And that's been borne out in technical papers that have emerged where the motorist is asked about age and they're clueless. Dealers are — a lot of them don't even know how to read a date code.
>
> But anyway, so as I say on Page 10, — "when age is believed to be an issue, basic communications from the tire industry, let alone warnings, are woefully inadequate." I, obviously, continue to feel that that statement is valid.
>
> Q.   Well, what I want to know in this particular case, is there anything that Michelin did or didn't do in this particular case as it relates to age, either in the way it designed its tire to resist degradation due to aging or in the way it warned its customers or anything about that that Michelin did or didn't do that caused the tire failure in this case as it relates to age?

A.   *For this particular tire, in this particular case, I do not consider age to be
applicable.*

*Id*. at 224-25 (emphasis added).

As to the alleged design defect, the only potential defect suggested by Woehrle is
the failure to use nylon end caps, which increase tire longevity. But, as Michelin points out,
Woehrlre acknowledges in his deposition that nylon cap plies are simply one alternative
available to tire designers to compensate for belt edge stress, and that nylon cap plies have
significant disadvantages, including rolling resistance, flat spotting, passenger discomfort,
fuel inefficiency, and cost. As noted earlier, Woehrle is not a tire designer, and his opinion
does not rest on any attempt to rationally balance these competing values. As Michelin
observes, other courts have rejected under *Daubert* proposed expert testimony advancing
the nylon cap ply theory. *See Smith v. Goodyear Tire & Rubber*, 495 F.3d 224, 227 (5th Cir.
2007); *Vigil v. Michelin N. Am., Inc.*, 2007 U.S. Dist. LEXIS 72785 at *17-18 (W.D. Tex. Aug.
24, 2007).

In her response to Michelin's *Daubert* motion, Ho provides no specific rationale for
concluding that Woehrle's proposed testimony on this issue — that the failure to use nylon
end caps reflects a defective design — is supported by any testing, supported by any peer
reviewed studies, is corroborated by studies with documentable error rates, or is otherwise
accepted within the relevant scientific or engineering community. Given that Woehrle's
testimony on the failure to use nylon end caps constitutes a design defect is premised on

nothing other than his own *ipse dixit* that it might have prevented the accident, it would be error to allow its admission, and the court will grant the defendant's motion as to that claim.

Michelin also contends that Woehrle's testimony fails the Daubert standard with respect to his claims of manufacturing defects. As set forth earlier, Woehrle opines that the tire was defectively manufactured in that it contained a "very severe" offset or " dog-ear," improper belt stepoff, and an inadequate adhesive. As to the first two alleged defects, Michelin notes that while Woehrle complains of the size of the offset and the stepoff, he did not bother to actually measure either. He believes the offset was somewhere between one and one quarter of an inch. (Woehrle dep. at 97). He considers this offset as "very severe" as measured against his "rule of thumb" that any offset greater than a tenth of an inch is "very severe." Woehrle does not support this characterization with anything other than his own personal experience. (*Id*. at 92). His conclusion is not supported by any peer-reviewed studies, or reflected in generally accepted knowledge in the tire engineering community.

Similarly, Woehrle states in his report that there was "significant variation and reduction in the belt step" of the tire. (Woehrle Rep. at 3). Again, however, he did not measure the alleged stepoff, nor is he aware of industry tolerance standards for belt stepoff. He agrees that some variation in step-off is acceptable and even expectable, but that the

16

relevant question is "how much is too much?" (Woehrle dep. at 84). Again, Woehrle has supplied no technical background against which to measure his contention that the step-off in this tire was "too much" — his conclusion is advanced without reference to any of the measures recognized in Daubert, such as testing as to permissible and impermissible step-off, peer-reviewed studies, or other benchmarks of reliability. It is "too much" simply because he says it is.

In both instances, Woehrle acknowledges in his deposition that his conclusions are in fact contrary to the results contained in peer-reviewed studies. Woehrle conceded this contradiction between other studies and his belief that the offset or "dog ear" in the tire was "very severe" in comparison to his "rule of thumb," and his answer to the question "how much is too much" belt step-off in his deposition. Woehrle testified:

> Q. You're aware of the studies that have been done, I know, I've seen you -- but you're aware of the studies that have been done that talk about how these belt placement anomalies don't amount to a hill of beans and don't cause tire durability issues; you're aware of those studies?
>
> A. I'm aware of those studies, yes.
>
> Q. Are you aware of -- what studies do you have, testing, peer review publications, that would say that the step-offs that you see here will lead to a belt separation?
>
> A. I'm not aware of any publicly published information that supports my claim. I only base it on my experience at Uniroyal and what we dealt with.

(Woehrle dep. at 86-87).

17

Ho correctly stresses that personal experience may qualify an expert to render an opinion under Rule 702. But experience by itself does not satisfy the requirements of *Daubert* that a given opinion is reliable. Given that Woehrle's opinions as to the nature of the "belt placement anomalies" is untested, lacks support in peer-reviewed studies, is unaccompanied by any known or potential rate of error, and stands contrary to generally accepted understanding in the relevant engineering community, those opinions are not admissible in evidence.

Rather than meeting her obligation under *Daubert* to support Woehrle's proposed testimony with reference to reliable prior testing, peer-reviewed studies, measures subject to documentable error rates, and generally accepted engineering knowledge, Ho in her Response simply chooses to pound the table with unfounded accusations that the defendant is seeking to have the court "usurp the role of the factfinder," and "undertake the role of ... deciding what opinions ... are credible," all based upon the principle of "[m]ajority rules!"  (Dkt. 151, at 2, 3).

This argument is at odds with the court's obligation under *Daubert* to examine proposed expert opinions and determine not whether they have superficial plausibility, but have some grounding in the measures of reliability recognized under *Daubert*, a grounding beyond merely the expert's *ipse dixit*. This gatekeeping duty is not a measure of credibility, it is not an application of rule by majority, it is not a usurpation of the jury's role at trial.

It is an obligation directly placed on the court by Supreme Court directive in *Daubert* and *Kumho Tire.*

Nor can the tenor of the plaintiff's Response obscure the truly striking aspect of her pleading. Faced with Michelin's comprehensive challenge to Woehrle's reliability, her Response does not address the four *Daubert* factors. She makes no attempt to show that his opinions are documented by any extensive or reliable testing. She presents not a single peer-reviewed study which would corroborate his opinions. She identifies no basis by which those opinions might be subjected to review for error rates. And makes no attempt to place his opinions in the context of the general understanding within the relevant engineering community.

This failure continues with respect to the remaining opinions as to the claimed defect advanced by Woehrle: (1) the claim that the manufacturing defect is demonstrated by the color of the wires exposed in the damaged tire; (2) the contention that traffic impact damage can never produce a tread separation, and (3) the contention that overdeflection (improper inflation or an overloaded vehicle) can never cause tread separation. In each instance, the Response is merely a citation to Woehrle's experience in the tire industry, without any attempt to integrate those opinions into the *Daubert* framework.

Woehrle's claim that the brassy color of the wires shows an adhesion failure apparently rests on a single authority.

19

Q.  In terms of authorities that stand for that proposition as opposed to the principle that you just spoke of and the ambiguities that come with it, in terms of authorities that you could cite, you've got Rex Grogan?

A.  Right.

....

Q.  Rex Grogan is the only thing you're going to stand on for the proposition that brassy wire may be indicative of a defect in the adhesion?

A.  Well, his conclusion was simplistic. And, yes, that's one man's conclusion, and yes, I'm aware of his reputation and issues associated with him. But on the other hand, yeah, he has had a lot of experience as an expert -- tire forensics expert.

Q.  In terms of coming to that conclusion, do you know if he did any kind of testing or anything like that?

A.  No, I don't.

(Woehrle dep. at 274). In its motion, Michelin notes that Grogan's text has been found to be unsupported by peer review, *Cooper Tire Rubber Co. v. Mendez*, 204 S.W.3d 797, 801-02 (Tex. 2006), and that indeed Grogan has been found to have testified falsely under oath. Ho's response makes no mention of Grogan, or otherwise attempt to buttress the reliability for the opinion as to an adhesive failure.

With respect to Woehrle's opinions which would discount alternative causes for tread separation (impact damage and overdeflection), Ho again provides no support for these opinions, and Woehrle's deposition indicates that the opinion is supported solely by

his own generalized experience. (Woehrle dep. at 53). Ho concedes, as she must, that Woehrle's opinions are not otherwise supported in generally accepted engineering knowledge, but this understates their lack of support. In both instances, Woehrle's opinions as to impact damage and deflection are contradicted both by Ho's other expert, and by Gary Bolden (a tire investigator hired on behalf of Neal Lange, and not associated with defendant Michelin).

Bolden testified that the tire on Lange's vehicle failed because it has sustained impact damage within the last 500 miles. He has further stated that wear in the tire shows extensive overdeflection.

Cassidy, Ho's other expert, was asked about impact damage in his deposition:

> Q.   What about impacts? Could an impact to a road hazard, is that something that, if it occurred to a radial tire, could lead and damage to — could lead to a tread and top belt detachment?
>
> A.   Certainly.

(Cassidy dep. at 89). Further, with respect to overdeflection, Cassidy has testified that it is indeed "one of the potential causes of a tread and top belt detachment." (*Id*. at 88).

Ho notes that with respect to impact damage, Woehrle did perform some drop tests on a sample tire as a means of determining the effect of road damage. But as Michelin notes in its motion, the drop test is less reliable than the pendulum tests recommended by the

SAE paper otherwise relied on by Woehrle. In addition to being contrary to generally accepted engineering understanding, Woehrle's opinion as to alternative causation is unsupported by a measure error rate documentation, lacks any peer-reviewed studies, and is unsupported by any extensive or reliable testing.

There is no question but that Woehrle has extensive and credible experience in the tire industry. But this does not mean his pronouncements are automatically admissible at trial on that basis alone. The proper fulfilment of the court's gatekeeping duty requires more than passing along the opinion of a generally qualified expert merely because of his credentials. Under *Daubert*, "the expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert v. Merrerll Dow Pharms.*, 43 F.3d 1311, 1316 (9th Cir. 1995). Given the plaintiff's failure to otherwise document the reliability of his opinions within the *Daubert* framework, Woehrle's opinions are properly excluded.

### Summary Judgment Motion

As noted earlier, in conjunction with its *Daubert* motion, Michelin seeks summary judgment as to Ho's product liability claims. The court finds that the admissible evidence

submitted by the plaintiff fails to support a determination that the tire on the Lange vehicle was defective.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than

simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Applying these standards to the facts submitted by the parties, the court finds that it is uncontroverted that the plaintiff was involved in an accident on August 15, 2007, during which her 1998 Lincoln Town Car collided with a 2002 Ford F-250 driven by Linda Lange. Lange was pronounced dead at the scene of the accident and Melinda Ho sustained injuries.

The left front tire on Lange's truck — a Uniroyal Laredo AWP/LT 265/75R16 LR bearing DOT BFW8G9UU128 — was manufactured at Michelin's Fort Wayne, Indiana manufacturing plant during the 12th week of 1998, and experienced a detread event around the time of the accident at issue.

Trooper Benjamin D. Gardner, one of the officers investigating this accident, testified that the tread on the failed tire did not appear to be worn out: "There's a lot of depth in

the, technical word, sipes; the gaps down in there. The sipe area where the fall-down-in, there's a lot of gaps there, a lot of rise from the tread." (Gardner dep. at 36-37).

After the accident, investigating officer Benjamin Gardner took the failed tire to a tire store in McPherson, where he learned that the No. "128" appearing on the side of the tire was a code meaning that the tire had been manufactured during the twelfth week of the year 1998.

Patrick Cassidy, plaintiff's designated expert, has stated that he has never designed a tire and has no opinions regarding plaintiff's design defect theory. Asked whether he had an opinion as to whether "this tire had a manufacturing defect at the time it left the factory," Cassidy testified: "There's no scientific evidence that said that was the case from my investigation." (Cassidy dep. at 150)..

It is uncontroverted that Ho's other designated expert, William Woehrle, has never designed a steel belted radial tire and is not qualified as a tire designer. Woehrle admits that the fact that a tread detachment occurred does not mean the tire was defective at the time it left the factory and that events occurring during the service life of a tire can cause a tread detachment. He has stated that Michelin makes the best tires in the world.

Ho has not identified any express warranty made to her by Michelin, or alleged that she relied upon any such warranty. As to her claim of breach of warranty of merchantability, Ho has not alleged that the accident tire was used for anything other than

its ordinary purpose or that Michelin was informed that it would be used for any non-ordinary purpose. She has not alleged that the subject tire was not fit for its ordinary purposes. Finally, prior to filing the present lawsuit, Ho did not give Michelin any notice of her breach of warranty claims

Cassidy has admitted that he is not a warnings expert and does not intend to testify regarding warnings in this case.

Woehrle has admitted in other lawsuits that he is not a warnings expert. In addition, he has testified that there is no warning defect in this case. He also has agreed that age is not applicable to the tire failure in this case.

Neal Lange, who owned the vehicle involved in the accident, has testified that he never looked at the sidewall of the tire.

### Conclusions of Law

Kansas law recognizes that a given product may be defective as to its manufacture, its design, or in the instructions or warnings which accompanied the product. *See Delaney v. Deere & Co.*, 268 Kan. 769, 774, 999 P.2d 930, 936 (2000). As this court has recognized,

> [t]o establish a prima facie case based on negligence or strict liability in a products liability case, plaintiff must produce evidence to establish three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left defendant's control. *See Jenkins v. Amchem Prods., Inc.*, 256 Kan. 602, 630, 886 P.2d 869, 886 (1994). Under Kansas law, regardless of the

26

theory upon which recovery is sought for injury, proof that a product defect caused the injury is a prerequisite to recovery, and the condition which caused the injury-be it a manufacturing defect, a warning defect or a design defect-must have existed at the time the product left defendant's control. *See Wilcheck v. Doonan Truck & Equip., Inc.*, 220 Kan. 230, 235, 552 P.2d 938, 942 (1976); *Stadtherr v. Elite Logistics, Inc.*, No. 00-2471-JAR, 2002 WL 1067682, at *6 (D.Kan. May 7, 2002); *Samarah v. Danek Med., Inc.*, 70 F.Supp.2d 1196, 1202 (D.Kan.1999).

*Messer v. Amway Corp.*, 210 F.Supp.2d 1217, 1227 (D. Kan. 2002).

Michelin argues in its motion that Ho's product liability claims — whether sounding in negligence or strict liability —  cannot be maintained under Kansas law, since she has failed to present admissible expert opinion testimony in support of those claims, citing *Gaumer v. Rossville Truck and Tractor*, 41 Kan.App.2d 405, 202 P.3d, 81, 84-85 (2009).

Ho argues that *Gaumer* is not binding here because that case involved the law of evidence under Kansas law and thus is not controlling in the present action, which is governed by the Federal Rules of Evidence. Further, she stresses that *Gaumer* involved the sale of "extraordinarily complex" farm equipment, and rather than holding that expert testimony is necessary in all cases alleging a defective product, the *Gaumer* court held only that the necessity of expert testimony "is dependent on whether, under the facts of a particular case, the trier of fact would be able to understand, absent expert testimony, the nature of the standard of care required of defendant and the alleged deviation from the standard." 41 Kan.App.2d at 409.

However, the court finds that plaintiff's claims require proof by expert testimony. Ho does not argue that the present action involves matters within the common understanding of the typical juror, nor does she contend that her claims are supported by non-expert testimony. Rather, she contends solely that her claims are "richly supported by [Woehrle's and Cassidy's expert] evidence." (Dkt. 141, at 22). In addition, as Michelin notes, Ho states in the preface to her Response that

> the issues that Michelin seeks to have resolved via summary judgment are *of such a technical nature that they are difficult to explain without visual aids*, such as photograph or the failed tire and its wheel, *accompanied by an expert's commentary*.

*Id*. at 15 (emphasis added). Accordingly, Ho's product claims are viable only to the extent that they are supported by reliable expert testimony.

In addition, with respect to the plaintiff's partial reliance on the original, unsworn expert reports in her Response to the Motion for Summary Judgment, this court has repeatedly emphasized that, when tested at summary judgment, the proponent of expert testimony may not simply present the unsworn report of the proposed expert. *See Hildebarnd v. Sunbeam Products*, 396 F.Supp.2d 1241, 1250 (D. Kan. 2005); *Employers Reinsurance Corp. v. Mid-Continent Casualty*, 202 F.Supp.2d 1221, 1228 n. 6 (D.Kan. May 23, 2002), *aff'd in part and rev'd in part on other gds.*, 358 F.3d 757 (10th Cir. 2004); *Estate of Sisk v. Manzanares*, 262 .F.Supp.2d 1162, 1168 n. 4 (D. Kan. 2002) (court considered unsworn expert report submitted in response to summary judgment motion only because

defendants failed to object); *Wayman v. Amoco Oil Co.*, 923 F.Supp. 1322, 1371 (D.Kan.1996) (excluding plaintiff's expert report submitted in response to summary motion, emphasizing that the report, "either in whole or in part, is *not* admissible," and plaintiff should have either set forth the expert's opinions in an affidavit or portions of his deposition testimony), *aff'd*, 145 F.3d 1347 (10th Cir.1998) (unpublished table opinion); *Gazaway v. Makita U.S.A., Inc.*, 11 F.Supp.2d 1281, 1287 n. 8 (D.Kan.1998) (excluding expert reports containing inadmissible hearsay and unverified by supporting affidavit), aff'd, 182 F.3d 931 (10th Cir.1999). Accordingly, in connection with Michelin's summary judgment motion, the court takes notice of those facts presented by plaintiff through the depositions of Cassidy and Woehrle.

### Warning

The warnings associated with a product may be defective if they fail to give adequate notice of its dangerous characteristics, and the maker has a duty to warn when it knows, or has reason to know, the product is likely to be dangerous during normal use. *Deines v. Vermeer Mfg. Co.*, 755 F.Supp. 350, 353 (D.Kan.1990). The satisfaction of this duty is determined with reference to "whether it was reasonable under the circumstances, whether the claim is based on negligence or 'even if the claim is made under the rubric of a strict products liability defect.'" *Miller v. Lee Apparel Co., Inc.*, 19 Kan.App.2d 1015,

1029-30, 881 P.2d 576, 587 (1994) (*quoting Richter v. Limax Int'l, Inc.*, 822 F.Supp. 1519, 1521 (D.Kan.1993)). Expert testimony may be required to show the feasibility, adequacy, and effectiveness of a given warning. *See Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175, 1181-1182 (10th Cir. 1995).

The plaintiff's warning claim is subject to summary judgment on several grounds. First, plaintiff has presented no admissible evidence on the inadequacy of the warnings made with the tire. As noted earlier, both of plaintiff's experts acknowledge that they are not warning experts. (Cassidy dep. at 140, Woehrle dep. at 69).

Second, plaintiff's claim is unsupported even if the court were to reach a different conclusion as to Woehrle's ability to testify as an expert on the subject of warnings. Ho's theory is that the defendant, as a part of the tire industry generally, fails to educate the public as to the dangers of riding on aged tires. But Woehrle himself testified that "[f]or this particular tire, in this particular case, I do not consider age to be applicable." (Woehrle dep at 224).

Third, the plaintiff is required to show that the failure to warn caused her injury. *See Kernke v. The Mennninger Clinic, Inc.*, 173 F.Supp.2d 1117, 1122-23 (D. Kan. 2001). Here, however, she has failed to show that any alternative warning would have prevented the accident. It is uncontroverted that the owner of the truck, Neal Lange, never looked at any of the information contained on the tires.

Q.    Do — do you remember if you ever actually looked at the sidewall of
      the tire, any — to get any kind of information off of that tire at all?

A.    No.

Q.    You did — you did not?

A.    No.

....

Q.    Okay. Just to make it clear to this one answer, in terms of the sidewall
      of the tire, you know that there are some words and stuff that's written
      on there, and one of the things that's written on there is the DOT code,
      like we discussed; true?

A.    No, I don't know.

Q.    You don't — you don't know what's written on the sidewall of the tire?

A.    I didn't know, no.

(Lange dep. at 119, 120).

Altering the information attached to the tire accordingly would not have influenced

the eventual accident.


*Design Defect*

Plaintiff's claim of a design defect also lacks factual support. As noted earlier, and

as is the case with her claim of defective warning, plaintiff has failed to present evidence

from any experts in tire design. Again, both Cassidy and Woehrle acknowledge that they

31

are not tire design experts. (Cassidy dep. at 17; Woehrle dep. at 62, 64). In addition, the court finds that Woehrle's suggestion that nylon cap end plies might have avoided the accident reflects not simply an unqualified opinion, but one which has not been shown to be reliable under *Daubert*.  Accordingly, the court aligns itself with the other decisions, previously cited, which have found this theory to lack factual support.

### *Manufacturing Defect*

A claim of a defectively manufactured product under Kansas law requires proof that the product was defective, that the defect was the direct and proximate cause of plaintiff's injury, and that this defect existed at the time that it left the manufacturer. *Wilcheck v. Doonan Truck & Equipment*, 220 Kan. 230, 235, 552 P.2d 938, 942 (1976); *Lane v. Redman Mobile Homes*, 5 Kan.App.2d 729, 734, 624 P.2d 984 (1981).

Summary judgment is appropriate as to Ho's claim of manufacturing defect. As noted earlier, Woehrle's opinions as to the supposed manufacturing defects are unsupported by any of the indicia of reliability set forth in Daubert. Further, as with his conclusions about the effect of overdeflection and road impacts as a source of detreading, Woehrle's opinions as to the alleged manufacturing defects are contradicted by plaintiff's second expert, Patrick Cassidy. Cassidy testified:

Q.     And as you sit here right now, it's not your opinion, you haven't formulated the opinion that this tire had a manufacturing defect at the time it left the factory. You haven't come to that conclusion one way or the other. Is that true?

A.     There's no scientific evidence that said that was the case from my investigation.

(Cassidy dep. at 150). The plaintiff has failed to show that any defect existed in the tire at the time that it left the manufacturer, and that the failure did not arise as the result of other events in the intervening nine years

*Breach of Warranty*

Michelin argues that Ho's claims of breach of warranty (breach of express warranty, breach of implied warranty of fitness for a particular purpose, and warranty of merchantability) fail for three reasons. First, it argues that Ho cannot advance such claims because she was not the purchaser of the tire in question, and she failed to give pre-suit notice of her claim of breach of warranty under K.S.A. 84-2-607(3). Second, it argues that such claims fail because of her failure to otherwise demonstrate the existence of a product defect. Third, it contends that each of these claims fail because each lacks an essential element.

The court finds that defendant's argument is not supported by the statutory language of § 84-2-607(3), which by its terms only directly applies to the duty of a buyer to give notice of a potential breach. See 84-2-607(3) ("the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"). Rather, its argument is premised on the Official U.C.C. Comment 5:

> Under this Article various beneficiaries are given rights for injuries sustained by them because of the seller's breach of warranty. Such a beneficiary does not fall within the reason of the present section in regard to discovery of defects and the giving of notice within a reasonable time after acceptance, since he has nothing to do with acceptance. However, the reason of this section does extend to requiring the beneficiary to notify the seller that an injury has occurred. What is said above, with regard to the extended time for reasonable notification from the lay consumer after the injury is also applicable here; but even a beneficiary can be properly held to the use of good faith in notifying, once he has had time to become aware of the legal situation.

But the Official Comment is not conclusive. The companion Kansas Comment provides that "[t]his subsection of course does not apply when the plaintiff's cause of action is in strict liability in tort."

In applying the U.C.C., this court has previously held that § 84-2-607 does not require notice when the buyer is a consumer rather than a merchant. *Wichita v. U.S. Gypsum Co.*, 828 F.Supp. 851, 856–57 (D.Kan.1993), *rev'd on other gds.*, 72 F.3d 1491 (10th Cir.1996). In that case, the court held that applying the notice requirement against a consumer did

nothing to advance the commercial purposes of the statute, as recognized in prior Kansas cases. See 828 F.Supp. at 857 (citing *Dold v. Sherow*, 220 Kan. 350, 352, 552 P.2d 945, 947 (1976) ("the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy") and *Carson v. Chevron Chemical*, 6 Kan.App.2d 776, 784, 635 P.2d 1248, 1255 (1981)).

> Kansas law requires the court to focus on the purposes of giving notice under the totality of the circumstances. In *Smith v. Stewart*, 233 Kan. 904, 914, 667 P.2d 358, 366 (1983), the Kansas Supreme Court considered whether K.S.A. § 84–2–607(3) was an "absolute bar" to a plaintiff who failed to give pre-suit notice of an alleged breach of express warranty. 233 Kan. at 910, 667 P.2d at 363. The court quoted favorably from several sources indicating that pre-suit notice is not required in all cases. For example, "'[a] *comparably strict application of the notice requirement ... may not be appropriate in a case involving a consumer's claim of breach*.'" 233 Kan. at 912, 667 P.2d at 365 (emphasis supplied by *Stewart* court; quoting *Armco Steel Corp. v. Isaacson Struct. Steel*, 611 P.2d 507, 513 n. 15 (Alaska 1980)). Thus, "'[t]he defendant's lawyer whose client is sued not by merchant-buyer but by a consumer, especially by a consumer who suffered personal injury or property damage, should not rely heavily on a lack of notice defense.'" *Stewart*, 233 Kan. at 913, 667 P.2d at 366 (emphasis added; quoting White & Summers, Uniform Commercial Code § 11–10, at 423 (2d ed. 1980)). In addition, *Stewart* also recognized that "[a] commonly utilized exception to the requirement of giving notice of the defect within a reasonable time is involved in situations where the defective product has caused personal injury." 233 Kan. at 912, 667 P.2d at 365. In these cases, courts typically require no pre-suit notice, because the damage has already been done, and notice would not serve the purpose of allowing the seller to cure the defect. *Id.* at 913, 667 P.2d at 365 (quoting *Maybank v. Kresge Co.*, 302 N.C. 129, 134, 273 S.E.2d 681 (1981)). *See also Graham v. Wyeth Laboratories*, 666 F.Supp. 1483, 1500 (D.Kan.1987) (filing of lawsuit sufficient notice in personal injury action). Because "none of the purposes of the notice within a reasonable time requirement of K.S.A. § 84–2–607(3)(a) [were] served by blind adherence to the generally appropriate 'condition precedent' concept," 233 Kan. at 914, 667 P.2d at 366, the *Stewart* court concluded that

35

> plaintiff's express warranty claim was not barred for failure to give pre-suit notice of the defect. Thus, *Stewart* interprets pre-suit notice as a "requirement" only to the extent that notice would serve the underlying purpose of this "condition precedent." *See also Unified Sch. Dist. No. 500 v. U.S. Gypsum Co.*, 788 F.Supp. 1173, 1176 (D.Kan. 1992).

*Id. See generally* James J. White & Robert S. Summers, Uniform Commercial Code § 11-10, at 774 (5th ed. 2000) ("Not only the drafters but also the commentators and the courts seem to disfavor the lack of notice defense when invoked against an injured consumer").

However, the court agrees that the plaintiff's warranty claims are subject to summary judgment based on her failure to otherwise provide factual support for the existence of a defect. "Regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a defect in the product caused the injury is a prerequisite to recovery." *Wilcheck v. Doonan Truck & Equipment*, 220 Kan. 230, Syl. ¶ 1, 552 P.2d 938 (1976).

In addition, the court finds that plaintiff has failed to show the existence of any express warranty, within the meaning of K.S.A. 84-2-31 extending from Michelin to Lange or any other person as to the condition of the tire. There is no evidence that the tire was not "merchantable" within the meaning of K.S.A. 84-2-314 as, for example, being improperly packaged, labeled, are not of "fair average quality," or otherwise were not fit for its ordinary purpose as an automobile tire. And there is no evidence that the tire was used for some additional, particular purpose within the meaning of K.S.A. 84-2-315.

IT IS ACCORDINGLY ORDERED this 29th day of July, 2011, that defendant's

Motions to Exclude and for Summary Judgment (Dkt. 135, 144) are granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE